RECORD NUMBER: 14-6214

# United States Court of Appeals

## *for the*

# Fourth Circuit

**EUGENE N. DUNSTON,**

*Appellee,*

– v. –

**SHERIFF DONNIE HARRISON, in his official and individual capacities;
MICHAEL J. HAYES, Wake County Sheriff's Office Detention Officer, in
his individual capacity; WACO DOUGLAS, JR., Former Wake County
Sheriff's Office Detention Officer, in his individual capacity;
OHIO CASUALTY INSURANCE COMPANY, as surety;
DUANE D. GREENFIELD, Wake County Sheriff's Office Detention Officer,
in his individual capacity,**

*Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH

# BRIEF OF APPELLEE

ERIC LAURENCE DOGGETT
DOGGETT LAW OFFICES
3737 Glenwood Avenue
Suite 100
Raleigh, North Carolina 27612
(919) 782-2979

*Counsel for Appellee*

CP COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  14-6214        Caption:  Eugene Dunston v. Donnie Harrison et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Eugene Dunston
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Eric L. Doggett _____        Date: _____ 2/18/2014 _____

Counsel for: Eugene Dunston _____

# CERTIFICATE OF SERVICE
****************************

I certify that on _____ 2/18/2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/Eric L. Doggett _____                _____ 2/18/2014 _____
(signature)                                                        (date)

| Print | Save | Reset Form |

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES........................................................... 3

STATEMENT OF THE CASE .............................................................. 3

    The Pod Incident.................................................................... 5

    The Hall Incident .................................................................. 8

    The Inmate Processing Center Incident................................. 8

    District Court Order.............................................................. 11

SUMMARY OF ARGUMENT ............................................................ 12

STANDARD OF REVIEW ................................................................. 13

ARGUMENT .................................................................................... 14

    I.   THE DISTRICT COURT PROPERLY DENIED DOUGLAS'
       QUALIFIED IMMUNITY DEFENSE FOR HIS USE OF
       FORCE IN THE POD INCIDENT ............................................. 14

        A. The District Court correctly concluded that Dunston
           established that Douglas' conduct violated Dunston's
           constitutional right to be free from excessive force ................ 14

        B. Dunston's constitutional right as a pretrial detainee to be
           free from excessive force was clearly established at the time
           of the incident ......................................................................... 21

i

C. The district court did not abuse its discretion in ruling that Dunston was not judicially estopped from taking his factual position in the Pod Incident ........................................................ 23

II. THE DISTRICT COURT PROPERLY DENIED GREENFIELD'S QUALIFIED IMMUNITY AFFIRMATIVE DEFENSE FOR HIS USE OF FORCE IN THE HALL AND IPC INCIDENTS ........................................................ 27

A. The District Court correctly concluded that Dunston established that Greenfield's conduct violated Dunston's constitutional right to be free from excessive force ................. 27

B. Dunston's constitutional right to be free from excessive force as a pretrial detainee was clearly established.................. 29

CONCLUSION ............................................................. 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Berrey v. Asarco*, Inc.,
439 F.3d 636 (10th Cir. 2006) ............................................................ 2

*Browning Mfg. v. Mims* (*In re Coastal Plains, Inc.*),
179 F.3d 197 (5th Cir. 1999) .............................................................. 2

*Camp v. Brennan*,
54 Fed. App'x 78 (3d Cir. 2002) ........................................... 17, 18, 20

*Davis v. Zahradnick*,
600 F.2d 458 (4th Cir. 1979) .............................................................. 4

*Domitrovich v. Borough of Monaca*,
No. 2:08-cv-1094,
2010 U.S. Dist. LEXIS 90645 (W.D. Pa. Sept. 1, 2010) .................. 25

*Ealy v. Pinkerton Gov't Servs.*,
514 Fed. App'x 299 (4th Cir. 2013) .................................................... 2

*Edens v. Kennedy*,
112 Fed. App'x 870 (4th Cir. 2004),
*cert. denied*, 543 U.S. 1153 (2005) .................................................. 11

*Goodman v. Barber*,
No.7:11-CV-00153-F,
2012 U.S. Dist. LEXIS 149430 (E.D.N.C. Oct. 16, 2012) ............... 25

*Grayson v. Peed*,
195 F.3d 692 (4th Cir. 1999) ...................................................... 18, 20

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .......................................................................... 14

*Jones v. Buchanan*,
325 F.3d 520 (4th Cir. 2003) ...................................................... 23, 29

*King v. Herbert J. Thomas Mem. Hosp.*,
    159 F.3d 192 (4th Cir. 1998) ............................................................ 13

*Lowery v. Stovall*,
    92 F.3d 219 (4th Cir. 1996) *cert. denied*,
    519 U.S. 1113 (1997) ........................................................ 2, 23, 24

*McMillian v. Wake County Sheriff's Dep't*,
    399 Fed. App'x 824 (4th Cir. 2010) .................................................. 14

*Miller v. Leathers*,
    913 F.2d 1085 (4th Cir. 1990), *cert. denied*,
    498 U.S. 1109 (1991) ................................................... 17, 22, 30

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Mfrs. & Traders Trust Co.*,
    137 Fed. App'x 529 (4th Cir. 2005) ................................................ 13

*Orem v. Rephann*,
    523 F.3d 442 (4th Cir. 2008) ............................................. 15, 19, 29

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ........................................................................ 14

*Sawyer v. Asbury*,
    537 Fed. App'x 283 (4th Cir. 2013) .......................................... *passim*

*Scott v. Harris*,
    550 U.S. 372 (2007) ........................................................................ 13

*United States v. Cobb*,
    905 F.2d 784 (4th Cir. 1990) ...................................................... 17, 22

*Wilkins v. Gaddy*,
    559 U.S. 34 (2010) .......................................................................... 15

*Williams v. Griffin*,
    952 F.2d 820 (4th Cir. 1991) ............................................................. 3

*Winfield v. Bass*,
    106 F.3d 525 (4th Cir. 1997) ............................................................. 1

*Winters v. Adams*,
    254 F.3d 758 (8th Cir. 2001) ............................................................ 26

*Witt v. W. Va. State Police*,
    633 F.3d 272 (4th Cir. 2011) ............................................................ 1

**Rules, Statutes, and Other Authorities:**

28 U.S.C. § 1292(b) ............................................................ 1, 2, 12

42 U.S.C. § 1983 ............................................................ 4, 14, 25

## JURISDICTIONAL STATEMENT

Appellee Eugene Dunston ("Dunston") accepts the Defendants-Appellants' Statement of Subject Matter and Appellate Jurisdiction as to the jurisdiction of the district court. Dunston accepts the Statement as to this Court's appellate jurisdiction to review the district court's denial of qualified immunity to the extent that review of whether there was a "violation of clearly established law *accepting the facts as the district court viewed them*" is sought. *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc) (holding that the Court had no jurisdiction to review the denial of qualified immunity to the extent the appeal challenged that the evidence presented by the plaintiff was insufficient to raise a genuine issue of material fact necessitating a trial) (emphasis added); *Witt v. W. Va. State Police*, 633 F.3d 272, 275-78 (4th Cir. 2011) (dismissing the troopers' appeal where the proffered video evidence did not "clearly" or "blatantly" contradict the plaintiff's account because the "troopers' attempt to rehash the factual dispute below provide[d] no basis for interlocutory appeal of the district court's order denying summary judgment on qualified immunity grounds").

This Court lacks jurisdiction over the interlocutory appeal of the district court's ruling that Dunston was not judicially estopped from taking his factual position in the instant case related to his claims against Defendant Waco Douglas ("Douglas") because this ruling was not certified pursuant to 28 U.S.C. § 1292(b).

*Compare Browning Mfg. v. Mims* (*In re Coastal Plains, Inc.*), 179 F.3d 197, 204 (5th Cir. 1999) (observing that a prior appeal of the denial of judicial estoppel was dismissed because "most unfortunately, [the appellant] did *not* seek certification from the district court that, pursuant to 28 U.S.C. § 1292(b), the judicial estoppel ruling 'involved a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation'.") *with Lowery v. Stovall*, 92 F.3d 219, 220-22 (4th Cir. 1996) (reviewing judicial estoppel ruling on plaintiff's appeal of grant of summary judgment).  However, "under *Swint* [*v. Chambers County Comm'n*, 514 U.S. 35 (1995)] it is appropriate to exercise pendent appellate jurisdiction *only* where [1] resolution of the appealable issue necessarily resolves the nonappealable issue, or [2] where review of the nonappealable issue is necessary to ensure meaningful review of the appealable one." *Ealy v. Pinkerton Gov't Servs.*, 514 Fed. App'x 299, 308-10 (4th Cir. 2013) (unpublished) (*citing Berrey v. Asarco*, Inc., 439 F.3d 636, 647 (10th Cir. 2006)) (internal quotations omitted) (emphasis added).

## STATEMENT OF THE ISSUES

**I.    DID THE DISTRICT COURT ERR IN HOLDING THAT DEFENDANT DOUGLAS WAS NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW FOR HIS USE OF FORCE DURING THE "POD" INCIDENT?[1]**

**II.   DID THE DISTRICT COURT ERR IN HOLDING THAT DEFENDANT GREENFIELD WAS NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW FOR HIS USE OF FORCE IN THE "HALL" AND "INMATE PROCESSING CENTER" INCIDENTS?**

## STATEMENT OF THE CASE

Dunston files this Statement of the Case in order to allow this Court to view the facts as the district court viewed them and as the standard of review requires. (JA 970 n.2 and n.3)

On December 21, 2011, Dunston filed suit against Sheriff Harrison ("Sheriff") and his surety, the Ohio Casualty Insurance Company, Waco Douglas ("Douglas"), and Michael Hayes ("Hayes") for constitutional violations and related state law claims for incidents that occurred on September 25, 2010 (for Douglas' conduct in the "Pod" incident), and September 3, 2011 (for Hayes' conduct).  (JA 3)  On March 6, 2012, Dunston filed a verified Amended Complaint[2] that added

---

[1]    Defendants-Appellants' Statement of the Issues frames the question of qualified immunity as limited to the take downs in each of the three incidents. However, the incidents in question each also involve claims for post-take down assaults, hence Dunston has presented his Statement of the Issues accordingly.

[2]    "[A] *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on

3

Duane Greenfield ("Greenfield") as a defendant for his conduct on September 25, 2010, in the "Hall" incident and "Inmate Processing Center" incident ("IPC Incident")." (JA 4, 12-51) The Defendants-Appellants' appeal is limited to the district court's rulings related to the conduct of Douglas and Greenfield in the September 25, 2010, Pod, Hall, and IPC incidents. Dunston's response is limited to the issues raised by the Defendants-Appellants in their appeal.

Dunston contends that he was intentionally assaulted and subjected to excessive, force first by Douglas in the Pod incident and later, twice, by Greenfield in the Hall and IPC incidents on September 25, 2010, when he was incarcerated at the Wake County Detention Center ("WCDC"). Dunston had been held since June 24, 2010, as a detainee awaiting trial on charges of which Dunston was later found not guilty by jury trial on May 17, 2011. (JA 19-21, 29) After Dunston filed the instant suit, the Sheriff produced video recordings of the Pod incident and the IPC incident; however no video of the Hall incident has been produced by the Sheriff.[3]

---

personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (*citing Davis v. Zahradnick*, 600 F.2d 458, 459-60 (4th Cir. 1979) (vacating summary judgment because the factual allegations contained in a *verified* complaint established a prima facie case under 42 U.S.C. § 1983) (emphasis added).

[3] The "Pod Video" ("Pod Video") and "Inmate Processing Center Video" ("IPC Video") have been submitted as one disc as part of the Joint Appendix and were also submitted to the District Court. (JA 88, 713) The parties cite to each video and specific frame numbers of these videos.

### The Pod Incident

The Pod incident was triggered by Dunston's complaints about Douglas' failure to follow the proper WCDC "lock out" procedure for meals that resulted in Dunston being late for mealtime. (JA 22-23) It is undisputed that: the WCDC mealtime "lock out" procedure required Douglas, the Pod officer, to inspect and lock each cell to ensure that all detainees had exited at mealtime; Dunston was late for mealtime; Dunston's meal tray was not available; Dunston and Douglas had words; Douglas called for a meal tray; Officer James ("James") brought the meal tray; and that Dunston finally received his meal tray. (JA 21-22,57,165-71,402-07,830-34) Dunston was late for mealtime because Douglas did not follow the WCDC lock out procedure, however Douglas disputes this.[4] *Id.*

Douglas told Dunston that he should "have his old ass in line at mealtime," to which Dunston responded by lecturing Douglas in front of James while gesticulating, that Douglas had a duty to feed the detainees and that Douglas' failure to follow jail procedure resulted in Dunston being late for his meal; Douglas then told Dunston to take his tray and sit down. (JA 23, 167-73, 830-37; Pod Video 5-180) The district court believed that the Pod Video showed that Dunston was

---

[4]     Sergeant Leach, Douglas' supervisor, testified that she was aware of only one or two lapses in the lock out procedure for mealtime since 2006, and she was not aware that Douglas had been accused of violating this procedure. (JA 282, 334-38) Greenfield did not review surveillance video to determine if Douglas had violated WCDC procedure. (JA 461-63)

yelling at Douglas and pointing his finger in a combative, aggressive manner, however Dunston's account is not blatantly contradicted by the Pod Video. (JA 970; Pod Video 100-80) Even James was offended by *Douglas'* comments. (JA 243) Dunston took his tray, turned away from Douglas, and moved to take his seat in compliance. (Pod Video 180-200) Douglas then told Dunston that he was going to "beat your old ass" as he unbuckled and removed his duty belt. (JA 22-23,167-68, 830-35; Pod Video 200-30) When Dunston heard Douglas' threat, he turned and saw Douglas removing his duty belt, so Dunston braced for Douglas' assault by setting his tray down and kicking off his slippers.[5] (JA 23, 835; Pod Video 200-60) Douglas claims that he removed only his radio *after* Dunston kicked off his slippers and that Dunston came towards him before Douglas took him down, however, as found by the district court, the Pod Video contradicts Douglas' account and supports Dunston's account. (JA 173, 971; Pod Video frames 170-300) Douglas did not give Dunston any orders, such as to turn around to be handcuffed, apply any "soft-hands" techniques, or ask for or allow James to provide any assistance prior to taking Dunston to the floor and beating him. (JA

---

[5]     Officers are not trained to remove their duty belt except for unique circumstances that were not present in this case. The removal of an officer's duty belt was not a practice or custom and could compromise safety, and it was indicative of Douglas' assaultive intent. Though Dunston claims and the Pod Video clearly shows that Douglas removed his duty belt, Douglas' and James' reports do not mention this highly unusual act. (JA 411-12,562, 1020-21,1050-51,1054-55)

23, 172-74, 204-06, 245-46, 1050-51, 1054)  Douglas charged at and grabbed Dunston's torso, lifted Dunston in the air, and slammed Dunston down backwards on his head, neck, and upper back on the jail floor, and then Douglas struck Dunston in the head, face, and body repeatedly with his fists.  (JA 23, 835 Pod Video 260-470)

Dunston stipulated, and stipulates again, that sometime during the eight seconds after the take down and before James made the "all available" radio call, Dunston assaulted Douglas by hitting him in the back of the head.  (JA 971, 977; Pod Video 300-80)  Even after he took Dunston down, Douglas did not tell him to stop resisting or to put his hands behind his back to be cuffed.  (JA 838-39)  The Pod Video also shows that it was Douglas' take down and subsequent beating of Dunston that caused any disruption, not Dunston's prior conduct.  (Pod Video 300-700)

Douglas kneeled on Dunston and beat him with closed fists until Douglas was stopped by responding officers, however, Douglas still disobeyed his superior's orders and re-engaged with Dunston until *Douglas* was forcibly removed.  (JA 23-24, 174, 374-75; 835-36; Pod Video 960-1090)  Sergeant Leach, Douglas' immediate supervisor, testified that she moved Douglas off of Dunston and pushed him out of the Pod and that Douglas was upset, which, together with the IPC Video showing Douglas' attempt to re-engage with Dunston yet again,

supports Dunston's assertion that Douglas was out of control. (JA 282-83, 291,293,305-09,314-15,1052; IPC Video 280-1090)

## The Hall Incident

In the Hall incident, Greenfield took Dunston to the ground when he locked his arms around Dunston's body and arms and essentially fell on top of Dunston, who landed face down on the floor. (JA 377-80) Greenfield beat and kicked Dunston on the floor *after* Dunston was restrained and was under control. (JA 24, 125-26, 377-82, 1052, 1054-55) No video of the Hall incident was produced, which left approximately a three-minute gap from when Dunston was last seen in the Pod Video until he is seen again in the IPC Video according to the timestamps on the videos. (Pod Video 1290 (4:23:26 p.m.); IPC Video 150 (4:26:14 p.m.)) Approximately one to two minutes passed from the time that Dunston was led from the Pod until he was taken down again and fully handcuffed in the Hall. (JA 382)

## The Inmate Processing Center Incident

The Inmate Processing Incident Video shows that a restrained Dunston was violently "taken down" by Greenfield and supports Dunston's account that Greenfield beat Dunston while he was on the floor after the take down. (IPC Video 500-1400; JA 24) Dunston, who was handcuffed behind his back, asked repeatedly to not be placed in a small attorney's room because he had a reasonable fear of being beaten again in the unmonitored room in light of the earlier assaults,

8

and Douglas' taunts that he would beat him again once inside the room.  (JA 24, 323-36, 844-46)   Dunston resisted Greenfield's attempt to push him into the attorney's room by leaning away from the room.  (IPC Video 945-93)  Greenfield did not ask for assistance from either Sergeant Hicks or Leach, who were standing beside Dunston and did not react as though Dunston posed a threat.  (JA 327-28)  Greenfield grabbed Dunston's throat with his right hand and grabbed the back of Dunston's neck with his left hand, encircling Dunston's entire neck and throat, and lifted Dunston into the air and backwards over Greenfield's leg and threw Dunston to the floor head-first, and then Greenfield beat Dunston.  (JA 24, 845-46; IPC Video 993-1070)  Greenfield's lifting of the restrained Dunston by his neck and throat and throwing him head-first to the floor can be considered deadly force because Dunston could not use his hands, which were handcuffed behind his back, to break his fall.[6]  (JA 542-44, 588-92)   Greenfield was upset and was not in control when he took down Dunston and beat him on the floor and Leach had to pull Greenfield off of Dunston and push Greenfield out of the way.  (JA 330-34, 845-46, 1052; IPC Video 1090-1370)  Douglas charged toward Dunston again, but

---

[6]     The Pod and IPC Videos show two "take down" maneuvers performed on Dunston.   Throughout the deposition testimony, officer statements, and investigation documents, this maneuver is variably referred to as "take downs," being "taken down," being "placed on the floor," "taken to the floor," "took inmate [] to the ground," and "assisting [] to the floor."  The Pod and IPC Videos of two of the "take downs" may assist the Court in interpreting the documentary and testimonial references to the unrecorded Hall incident "take down."

Leach and Officer Gatling ("Gatling") restrained Douglas and Gatling removed Douglas from the area while Douglas and Dunston exchanged words. *Id.* Dunston was then allowed to sit in in the IPC in full view of the surveillance camera, was taken to see the nurse, wrote a statement, and spent over a half hour unrestrained without incident. (JA 25; IPC Video 7350-21390) Dunston suffered injuries to his tongue, his knee, his left shoulder, abrasions to his back and right arm, and facial injuries with bleeding. (JA 743-46, 860-64, 892, 894, 896-900, 904-07) Two days later Dunston's facial swelling was serious enough that the jail physician ordered Dunston taken to WakeMed Hospital for X-Rays for possible fractures and prescribed pain relievers. *Id.*

Dave Cloutier, Dunston's designated use of force expert witness, provided a sworn report that stated: 1) Dunston's description of events appear consistent with the Pod and IPC Videos; 2) the force used by Douglas and Greenfield as shown in the videos and as described by Dunston was inconsistent with standard detention officer training and practices relative to the reasonable use of force, and; 3) after review of the Pod and IPC Videos and in consideration of Dunston's account, the actions of Douglas and Greenfield may be deemed malicious and sadistic with the intent to cause willful harm and pain and suffering to Dunston; and 4) a reasonable detention officer would know that this conduct under the observed and described

circumstances violated detention officer training and standards.[7] (JA 558, 1019-25) Cloutier testified that Douglas' removal of his radio and duty belt prior to engaging in the altercation with Dunston was not consistent with normal procedures. (JA 561-62,593-94) The September 25, 2010, incidents were not investigated by the Sheriff as excessive force incidents but as an inmate disciplinary matter. (JA 355-56, 358-62, 458-63,546-47) Greenfield, a participant in the incidents who had not been trained to investigate excessive force claims, took the statements from all witnesses. *Id*.

## District Court Order

With respect to the Pod incident, the district court held that, as a matter of law, Douglas was specifically not entitled to qualified immunity for his initial take down of Dunston, or for his use of force that took place behind the meal tray cart, and ruled that the determination of whether Douglas may be entitled to qualified immunity for any other portions of the Pod incident had to be determined at trial because that issue was not raised in the Defendants-Appellants' Motion for Summary Judgment. (JA 980-85) The district court held that Greenfield was not

---

[7]   Defendants-Appellants cite to their expert report of John Combs, however this report is not competent evidence because it is unsworn, an issue to which Dunston objected to in his Response in Opposition to Summary Judgment and the District Court did not appear to rely upon Combs' report in its Order. (JA 699-712, 968-997); *see Edens v. Kennedy*, 112 Fed. App'x 870, 879 (4th Cir. 2004) (per curiam) (unpublished), *cert. denied*, 543 U.S. 1153 (2005) ("[U]nsworn [expert] reports are inadmissible on summary judgment unless accompanied by affidavits or depositions swearing to their contents and conclusions.").

entitled to qualified immunity as a matter of law for his use of force during the Hall Incident, which included his take down *and* assault on Dunston *after* he was handcuffed.  (JA 985-86)  The district court held that Greenfield was not entitled to qualified immunity as a matter of law for his take down of Dunston in the IPC incident, but did not explicitly address the post-take down beating of Dunston.  (JA 24, 845-46, 986-89; IPC Video 993-1070)

## SUMMARY OF ARGUMENT

The district court properly denied qualified immunity because the undisputed facts of this case do not establish as a matter of law that the conduct of Defendants Douglas and Greenfield did not violate Dunston's clearly established rights.  The appeal of the district court's ruling that  Dunston was not judicially estopped from taking his factual position in the instant case is interlocutory and is not properly before this Court because it has not been certified as immediately appealable pursuant to 28 U.S.C. § 1292(b).  Defendants' characterization of the issue as one of qualified immunity does not necessarily remedy this jurisdictional defect.  However, the district court did not abuse its discretion in holding that Dunston was not judicially estopped from taking his factual position regarding the Pod incident because it is not inconsistent with the judicially accepted facts of his prior plea allocution.

## STANDARD OF REVIEW

In an appeal of a district court's denial of qualified immunity at summary judgment, this Court reviews *de novo* the district court's legal conclusions as applied to the facts viewed in the light most favorable to Dunston, and all reasonable inferences should be made in favor of Dunston, to the extent that Dunston's account of a genuinely disputed material fact is not "blatantly contradicted by the record, so that no reasonable jury could believe it." *See Scott v. Harris*, 550 U.S. 372, 377-78, 380-81 (2007) (reversing denial of qualified immunity at summary judgment where the plaintiff's account of a material fact was "so utterly discredited by the [video recording] that no reasonable jury could have believed him").

This Court reviews the district court's ruling regarding the equitable doctrine of judicial estoppel for abuse of discretion. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Mfrs. & Traders Trust Co.*, 137 Fed. App'x 529 (4th Cir. 2005) (*citing King v. Herbert J. Thomas Mem. Hosp.*, 159 F.3d 192, 196, 198 (4th Cir. 1998)) (per curiam).

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY DENIED DOUGLAS' QUALIFIED IMMUNITY DEFENSE FOR HIS USE OF FORCE IN THE POD INCIDENT.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A government official is not entitled to qualified immunity if, construing the facts in the light most favorable to the plaintiff, his actions violated a constitutional right and that right was clearly established at the time of the violation. *See id.* at 231-36; *McMillian v. Wake County Sheriff's Dep't*, 399 Fed. App'x 824, 827 (4th Cir. 2010) (per curiam) (vacating order granting summary judgment based on qualified immunity for pretrial detainee's § 1983 excessive force claim where the defendant officers claimed that their use of force was justified by the need to restore order and restrain the detainee because the detainee's submissions showed that he was beaten after he was restrained) (unpublished).

### A.    The District Court correctly concluded that Dunston established that Douglas' conduct violated Dunston's constitutional right to be free from excessive force.

The district court correctly concluded that, construing the evidence in the

14

light most favorable to Dunston, Dunston adequately demonstrated that Douglas inflicted unnecessary and wanton pain and suffering and violated his right as a pretrial detainee to be free from excessive force as protected by the due process clause of the Fourteenth Amendment. *See Orem v. Rephann*, 523 F.3d 442, 445-46 (4th Cir. 2008), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). The district court applied the correct legal standards for determining excessive force in the context of a pretrial detainee,

> Dunston must show that the officers "'inflicted unnecessary and wanton pain and suffering[,]'" *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998) (internal quotation marks omitted), *abrogated on other grounds by Wilkins*, 559 U.S. at 38, and that "the officers' actions amounted to punishment and were not merely 'an incident of some other legitimate government purpose.'" *Robles v. Prince George's Cnty., Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (*quoting Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).
>
> The Fourth Circuit requires consideration of the following factors in determining whether an officer inflicted unnecessary pain and suffering on a pretrial detainee: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; and (3) whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm. *Orem*, 523 F.3d at 446 (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Severity of injury is no longer required to succeed on a pretrial detainee excessive force claim. *Wilkins*, 559 U.S. at 38.

(JA 979)  While the facts of this case are "vigorously disputed," the district court found that Dunston's account was generally supported by the Pod Video.[8]

In *Sawyer v. Asbury*, 537 Fed. App'x 283 (4th Cir. 2013), this Court affirmed the district court's grant of a post-verdict renewed judgment as a matter of law for the plaintiff, holding that the defendant deputy violated the plaintiff's right as a pretrial detainee to be free from excessive force.  *Sawyer*, 537 Fed. App'x at 284.  In that case, the plaintiff spouted a stream of threatening invective against the deputy, exhibited a "danger cue," and took a "defiant" posture.  *Id*. at 285-86.  The two then engaged in a "heated verbal argument" that included "abrasive" and inappropriate language and gesticulation from both parties, the plaintiff's threat to "take [the deputy's] badge off [his] chest and shove it up [his] ass," and the plaintiff's refusal to follow the deputy's repeated orders to stand so he could be fingerprinted and photographed.  *Id*. at 286.  The deputy then grabbed the plaintiff by the throat and struck him in the face at least once as two other deputies approached and helped restrain the plaintiff.  *Id*. at 286-87.  This Court held that the evidence, *even when viewed in the light most favorable to the defendant deputy*,

---

[8]      The District Court did conclude that the Pod Video, which showed Dunston from behind with his right hand gesticulating in a pointing fashion while speaking with Douglas, established that Dunston yelled and pointed his finger at Douglas in a combative, aggressive manner directly contradicting Dunston's deposition testimony that he calmly asked for his meal tray and that only Douglas used any vulgar, aggressive language. (JA 979)  Dunston disputes that the Pod Video blatantly contradicts his account.

conclusively established excessive force as a matter of law because the deputy's "deployment of a blow to the head of the [plaintiff], a detainee, in response to mere insulting words and noncompliance with the deputy's orders, was excessive. Such conduct did not constitute a good faith effort to maintain or restore discipline." *Sawyer*, 537 Fed. App'x at 295; *see also, Miller v. Leathers*, 913 F.2d 1085, 1089 (4th Cir. 1990) (en banc), *cert. denied*, 498 U.S. 1109 (1991) (holding that verbal provocation alone is not sufficient to warrant use of force in an Eighth Amendment excessive force case); *see also*, *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990) (applying the Eighth Amendment excessive force standard set forth in *Miller* to pretrial detainees).

In contrast, in *Camp v. Brennan*, 54 Fed. App'x 78 (3d Cir. 2002), the Third Circuit held that the defendant officers' use of force was not excessive under the Eighth Amendment. *Camp*, 54 Fed. App'x at 80. The plaintiff inmate pushed off a door with his foot, causing the group of officers who were escorting him to an observation cell to stumble off balance after they had extracted him from his cell for erratic and threatening conduct. *Id*. at 79. A stun gun was applied to the plaintiff at least once. *Id*. at 79-80. The Court held that this did not constitute excessive force because the plaintiff's physical act started the confrontation and the evidence of two brief applications of a stun gun was reasonably necessary to gain control of the struggling prisoner. *Id*. at 80. Similarly, in *Grayson v. Peed*, 195

17

F.3d 692 (4th Cir. 1999), this Court held that the plaintiff's repeated *physical* acts of attempting to force his way out of a cell, of refusing to remove his arm from the food slot which endangered officers walking the hall, jamming his foot into the cell door to keep the officers from closing it again, and continued violent conduct necessitated the pepper spraying and physical force that was used. *Grayson*, 195 F.3d 692, 696-97.

The instant case is remarkably similar to *Sawyer*. In both *Sawyer* and this case, the district court determined that the plaintiffs were verbally defiant and vulgar, that they gesticulated while engaged in a heated argument, and that they would not comply with a lawful command. (JA 23, 167-73, 830-37, 970-71; Pod Video 5-180) However, unlike *Sawyer*, here Douglas initiated a violent *physical* encounter *after* Dunston disengaged and moved to comply with Douglas' command.[9] (Pod Video 180-200; JA 970-71, 980-82) Douglas "essentially lifted Dunston off his feet and threw him to the floor" landing on the rear of his head, neck, and upper back. (Pod Video 200-300; JA 971) Douglas did not attempt any less violent alternative, such as commanding Dunston to stop to be handcuffed, or asking Officer James to assist in securing him. (Pod Video 5-300; JA 23, 172-74,

---

[9]     The Wake County Sheriff's Office Detention Use of Force Policy Reg. 502 (8/01/04) in effect during these incidents prohibited an officer "from using force solely as a result of verbal provocation. An officer shall not strike or attempt to strike an inmate who has *abandoned his resistance* or who is effectively restrained. The use of force as punishment is strictly prohibited." (JA 1002) (emphasis added).

18

204-06, 245-46, 1050-51, 1054) Neither the plaintiff in *Sawyer* nor Dunston attempted any "violent, unruly, or evasive act." In *Sawyer*, the Court held that the plaintiff's verbal tirade and continued refusal to comply with the officer's command was not a license to "take the gloves off." *Sawyer*, 537 Fed. App'x at 294. In the instant case, the district court correctly concluded that *no* force was warranted because Dunston had disengaged and complied with Douglas' order. (JA 981-82) Just as in *Sawyer*, here, there is video evidence that shows that Officer James, presumably a "reasonable officer" who stood several feet away, did not react in such a way as to suggest that Dunston exhibited threatening or volatile behavior. *Id.* at 297; (Pod Video 60-200). James stood still for over seven seconds as Douglas initiated the altercation when he left the back of the control desk area, approached Dunston, and removed his duty belt, and then James walked without urgency to Dunston and grabbed Dunston's arm only after Douglas violently took Dunston to the ground. (Pod Video 150-350) The conduct of James is a powerful indicator that a need to deploy violent force was not apparent to a reasonable officer. *See Orem*, 523 F.3d at 448 ("[W]e need not use hindsight or conjure up a pseudo-'reasonable officer' because, two other presumably 'reasonable officers' were at the scene.") Indeed, while the Pod Video shows Douglas striking Dunston repeatedly, it does not show that *any* of the other officers, including James, ever struck even a single blow on Dunston during the

19

entire Pod incident, and it was Douglas' take down and beating of Dunston that drew a crowd of spectating inmates, not Dunston's lecture. (Pod Video 300-1300). However, the Pod Video does show that James pushed Douglas off of Dunston while Sergeant Leach pulled Douglas away, that Douglas re-engaged Dunston, and that Douglas was finally pulled away and out of the Pod by Leach, supporting Dunston's account. (Pod Video 950-1130; JA 24, 835-36)

Unlike the plaintiffs in *Camp* and *Grayson*, here, Dunston did not initiate the physical altercation. Dunston did not push off a wall and cause Douglas to stumble off balance, as did the plaintiff in *Camp*. Dunston did not try to crawl out of a cell, threaten officers with his arm through a food slot, or force his foot into his cell door to keep it open, as did the plaintiff in *Grayson*. Here, Douglas' "deployment of a [violent take down] of [Dunston], a detainee, in response to mere insulting words and noncompliance with the [officer's] orders, was excessive. Such conduct did not constitute a good faith effort to maintain or restore discipline." *Sawyer*, 537 Fed. App'x at 295. The force was deployed *after* Dunston had disengaged and complied with Douglas' order, amounting to punishment, and therefore Douglas violated Dunston's constitutional right as a pretrial detainee to be free from the use of excessive force that amounts to punishment.

**B.    Dunston's constitutional right as a pretrial detainee to be free from excessive force was clearly established at the time of the incident.**

The district court correctly held that the right of a pretrial detainee to be free from officer-initiated physical assault when the detainee does not present any safety risk to the officer clearly was established on September 25, 2010, the date of the incident.  In so holding, the district court followed the thoughtful reasoning and case law as applied by this Court in *Sawyer*, a case that similarly held that such a right clearly was established on October of 2009.  *Sawyer*, 537 Fed. App'x at 284.

> The question of whether the right at issue was clearly established, is "assessed in light of the legal rules that were 'clearly established' at the time" of the conduct at issue.  *Messerschmidt v. Millender*, ___ U.S. ___, 132 S. Ct. 1235, 1245, 182 L. Ed. 2d 47 (2012) (citation and some internal quotation marks omitted). . . . And, the "'*nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity*,'" because "'*qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations*.'" *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (citations omitted).  Thus, "*officials can still be on notice that their conduct violates established law even in novel factual circumstances*." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

*Id*. at 295-96 (emphasis added).  In *Sawyer*, this Court held that its analysis of the first prong of the qualified immunity test was "drawn entirely from pre-2009 case law and does not involve any novel extension of precedent.  [Therefore,] [i]t was clearly established in October 2009 that 'words alone do not justify the excessive use of force against a pretrial detainee.'" *Id*. at 297 (*quoting Cobb*, 905 F.2d at

21

789) (emphasis added).

Additionally, *Miller* is factually very apposite to the case at bar. *Miller*, 913 F.2d 1085. In *Miller*, a prisoner refused a guard's order to sign and return a grievance decision and threatened and insulted the guard in an attempt to get his grievances in front of higher authorities. *Id*. at 1087. The guard removed the prisoner from his cell and escorted him down the prison hall to take him to see a superior officer as the two continued to verbally spar. *Id*. at 1088. The prisoner stopped because his path was blocked by a food cart, and when he heard the guard insult him again he turned to face the guard and returned the insult. *Id*. The guard characterized the prisoner's conduct of turning around to face him in the doorway while insulting him as demonstrating "apparent offensive intentions," particularly given the prisoner's history of violent conduct. *Id*. at 1088-89. The prisoner raised his handcuffed hands in defense as the guard raised his baton and struck him. *Id*. The prisoner mocked the guard and the guard struck him twice more. *Id*. The guard characterized the blows as defensive. *Id*. The prisoner pushed the guard away, picked up a broom handle to protect himself, and was eventually subdued with the help of other officers. *Id*. This Court vacated the district court's grant of summary judgment, holding that "verbal provocation alone does not justify a response such as occurred in this case." *Id*. at 1089. Certainly *Miller*, a 1990 case where this Court held that a prisoner's Eighth Amendment rights were violated by

a guard's use of force in response to verbal provocations after the prisoner had refused the guard's order, engaged in an intentionally provocative verbal confrontation, and made both defensive and offensive moves against the guard, clearly established Dunston's right as a *pretrial detainee* to be free from excessive force as of September 25, 2010.  *Accord Jones v. Buchanan*, 325 F.3d 520, 530 (4th Cir. 2003) (reversing summary judgment on qualified immunity grounds because officer's beating of a drunk, angry pretrial detainee who used foul language constituted excessive force).  Accordingly, the district court's rejection of Douglas' qualified immunity defense was legally correct.

C.    **The district court did not abuse its discretion in ruling that Dunston was not judicially estopped from taking his factual position in the Pod Incident.**

The district court correctly ruled that Dunston was not judicially estopped from taking his factual position in the instant case because his position is not inconsistent with his factual position that was judicially accepted when he pled guilty to the charge of assault on a government official for the Pod incident.  The doctrine of judicial estoppel does not bar *claims*; it precludes a party from taking a *factual position* that is *inconsistent* with a previous, judicially accepted factual position.  *See Lowery*, 92 F.3d 219, 223, *cert. denied*, 519 U.S. 1113 (1997) ("Courts may apply the . . . doctrine of judicial estoppel . . . to *preclude a party from adopting a position* that is inconsistent with a stance taken in prior

litigation.") (emphasis added).  While there is not a standard test to determine whether a party should be judicially estopped from taking a factual position, this Court requires that, *at a minimum,* the following three elements are *all* met:

> 1)  "the party sought to be estopped must be seeking to adopt a position [of fact] that is inconsistent with a stance taken in prior litigation,"

> 2)  "the prior inconsistent position must have been accepted by the court," and

> 3)  "the party sought to be estopped must have intentionally misled the court to gain unfair advantage."

*Lowery*, 92 F.3d at 223-24.  In *Lowery*, a case arising from a traffic stop where plaintiff Lowery injured Officer Redd and was shot by Officer Stovall, this Court found that the district court properly applied the doctrine of judicial estoppel to preclude Lowery from taking the position that Stovall shot him *before* Lowery assaulted Redd because it "necessarily conflict[ed]" with his earlier plea allocution that stated that Lowery cut Redd on the face with his metal key holder with the intention of maiming, disabling, or even killing Redd to escape, *and that he was doing so at the time that Stovall shot him.  Lowery*, 92 F.3d  at 220-26 (affirming grant of summary judgment on qualified immunity grounds).[10]

---

[10]     In *Lowery,* the plaintiff appealed the district court's final order granting summary judgment and closing the case, therefore his appeal of the judicial

Here, the doctrine of judicial estoppel does not apply because Dunston has not taken a factual position that is inconsistent with the facts stated in his allocution when he pled guilty to assaulting Douglas. Dunston made no representations as to Douglas' conduct or the legality of Douglas' conduct before and after the assault when Dunston admitted that he "engaged in an altercation with Waco Douglas of the Wake County Sheriff's Office who was serving as a detention officer, hit him in the back of his head." (JA 119-20); *see Domitrovich v. Borough of Monaca*, No. 2:08-cv-1094, 2010 U.S. Dist. LEXIS 90645, 8-10, 23-28 (W.D. Pa. Sept. 1, 2010) (unpublished) (holding that plaintiff's factual position supporting his § 1983 excessive force claim was not judicially estopped because it was not irreconcilable with his plea allocution for assault and resisting arrest, which made no representations as to the officer's conduct); *Goodman v. Barber*, No.7:11-CV-00153-F, 2012 U.S. Dist. LEXIS 149430, 15-17 (E.D.N.C. Oct. 16, 2012) (unpublished) (denying application of judicial estoppel where the prosecutor dismissed the plaintiff's resisting arrest charges while appeal of her district court conviction was pending because the sparse record did not establish that plaintiff was resisting arrest *at the time* the defendant officer employed excessive force).

However, to the extent that this Court finds that judicial estoppel should

---

estoppel ruling was not interlocutory and did not require certification, unlike the instant case.

apply, the doctrine's only remedy would be to preclude Dunston from denying that he assaulted Douglas when he hit him in the back of the head during the Pod Incident.   Dunston's plea allocution is consistent with Douglas' account that Dunston hit him in the head *after* he took Dunston to the floor and *before* James made the "all available" call during the Pod incident.  (JA 119-20, 205-06, 1050; Pod Video 300-80)  Dunston stipulated at summary judgment, and reiterates his stipulation in this appeal, that he indeed did assault Douglas by hitting him in the back of the head *after* being taken down by Douglas and *before* James made the "all available" call during the Pod incident.  (JA 971, 977-78)  Therefore, Dunston has not adopted a factual position that is inconsistent with either his plea allocution or even Douglas' own account.

Douglas' argument that Dunston's factual position in the instant case should be barred by his decision to plead guilty, or not allege a defense of self-defense is without merit and Douglas cites no apposite precedent in support.[11]  The superior court Judge's Order denying Dunston's Motion for Appropriate Relief is irrelevant to the application of judicial estoppel because it did not judicially accept any new

---

[11]     Defendants-Appellants cite *Winters v. Adams*, 254 F.3d 758, 765-66 (8th Cir. 2001) (reversing denial of qualified immunity in excessive force case where the plaintiff was kicking and flailing and had already struck the officer in the face *before* the officer landed his single punch), a case that makes no mention of the doctrine of judicial estoppel.

26

factual position of Dunston, or change his guilty plea or plea allocution.[12] (JA 123-25)  In the instant litigation, Dunston has not adopted a factual position that is inconsistent with his plea allocution, the legal effect of his guilty plea, or even Douglas' own account, so Dunston's position cannot be judicially estopped, as the district court correctly ruled.

## II.  THE DISTRICT COURT PROPERLY DENIED GREENFIELD'S QUALIFIED IMMUNITY AFFIRMATIVE DEFENSE FOR HIS USE OF FORCE IN THE HALL AND IPC INCIDENTS.

### A.  The District Court correctly concluded that Dunston established that Greenfield's conduct violated Dunston's constitutional right to be free from excessive force.

Greenfield argues that the district court erred in denying him qualified immunity for the Hall incident because he was justified in using force in handcuffing Dunston.  However, Greenfield ignores the record evidence that Greenfield also assaulted Dunston *after* he was fully restrained and on the floor.[13] (JA 24, 843-44)  Additionally, the IPC Video shows that Dunston complied and

---

[12]     Dunston's plea was entered after he had already served more than the 150 day maximum sentence for the assault charge.  (JA 19-21, 29, 100, 118)  Dunston did file a motion for appropriate relief to set aside his Superior Court guilty plea after Sheriff Harrison produced video evidence that had never been produced in the criminal proceedings.  (JA 30)  Dunston's motion was denied because the court found no constitutional irregularity related to the entry of his guilty plea in his *de novo* Superior Court appeal of his District Court conviction adequate to set aside his guilty plea.  (JA 123-25)  The denial of Dunston's motion for appropriate relief did not change Dunston's guilty plea or his allocution and no new factual position of Dunston was judicially accepted in that proceeding.  *Id.*

[13]  Unfortunately, no video of the Hall Incident was produced in discovery.

27

did not resist when he was brought to the Inmate Processing Center immediately after the Hall Incident. (IPC Video 500-50) Dunston did suffer injuries. (JA 24-25, 904-907) For the same reasons discussed above in Part I, Greenfield's conduct during the Hall Incident violated Dunston's clearly established rights as a restrained pretrial detainee to be free from excessive force.

Greenfield also contends that Dunston's failure to comply with his orders to enter an unmonitored attorney's room justified his use of force in the Inmate Processing Center Incident and that the IPC Video supports his contention. To the contrary, the IPC Video shows that Greenfield placed his hands around the *handcuffed* Dunston's *throat and neck*, picked him up *by his throat and neck*, and slammed Dunston head-first to the floor, and the district court correctly held that this constituted excessive force. (IPC Video 993-1070; JA 986-87) Such a maneuver on a handcuffed detainee could be considered deadly force. (JA 542-44, 588-92) As in *Sawyer*, the IPC Video shows Sgt. Leach and Sgt. Hicks, two presumably "reasonable officers" standing next to Greenfield and Dunston, did not react in such a way as to suggest that Dunston had exhibited threatening or volatile behavior. (IPC Video 700-1400) Moreover, Greenfield beat Dunston after the violent take down, and Hicks and Leach reacted by pushing and pulling Greenfield off of Dunston and keeping Greenfield away from Dunston. (JA 330-34, 845-46, 1052; IPC Video 1090-1370) Greenfield did not seek any assistance from either of

28

those officers before the violent take down.  (JA 327-28)  Applying the same standards discussed above in Part I, Greenfield's use of force clearly violated Dunston's right as a detainee to be free from excessive force for his take downs of Dunston in the Hall and IPC incidents, and for his beatings of the restrained Dunston after each take down.

### B.    Dunston's constitutional right to be free from excessive force as a pretrial detainee was clearly established.

Greenfield assaulted Dunston when he took Dunston down and beat the restrained Dunston in the Hall incident and again when Greenfield took the restrained Dunston down and beat him on the floor.  Greenfield was clearly on notice that his conduct in the post-handcuffing Hall incident and the post-take down IPC incident beatings were gratuitous, for no legitimate reason, and that it violated Dunston's clearly established rights.  *See Orem*, 523 F.3d at 446-47 (holding that use of taser on an actively resisting, but restrained, pretrial detainee violated plaintiff's right to be free from excessive force); *Jones*, 325 F.3d at 526, 529-31  (holding use of force against detainee excessive where detainee was handcuffed and did not present a risk to officer safety).

The district court believed that the IPC Video appears to show that Dunston attempted to "head-butt" Greenfield prior to the IPC incident take down, however, it appears instead that Dunston resisted Greenfield's efforts to push him into the attorney's room, which is consistent with Greenfield's testimony that Dunston

resisted and that Greenfield "*felt*" that Dunston was going to head-butt him because his head moved, not that Dunston actually tried to head-butt him. (JA 385, 451-53, 986-87)  However, even assuming *arguendo* that Dunston attempted to head-butt Greenfield, this would not constitute a life threatening assault and it was clearly established that an officer was not authorized to use the deadly force that Greenfield's head-first violent take down of Dunston constituted. (JA 542-44, 588-92, 987-89, 1001-02)  As discussed in Part I above, *Miller* clearly established the right of a restrained pretrial detainee, even one who is verbally provocative and physically resistive, to be free from excessive force as early as 1990.  The district court followed this Court's analysis in *Sawyer* to reach the same conclusion. (JA 987-89)  Certainly Greenfield was on notice that his conduct in picking up the restrained Dunston by his neck and throat and throwing him head-first to the floor for his *feeling* that Dunston was going to "head-butt" him when he had two other officers an arms-length away violated Dunston's clearly established right as a pretrial detainee to be free from excessive force.

## **CONCLUSION**

For all the reasons stated above, Plaintiff-Appellee Dunston respectfully requests that the district court's Order be affirmed and that this Court find that Defendants-Appellants Douglas and Greenfield are not entitled to qualified immunity as a matter of law.

Respectfully submitted, this the 9th day of May, 2014.

/s/ Eric Laurence Doggett
Eric Laurence Doggett
Doggett Law Offices
3737 Glenwood Avenue
Suite 100
Raleigh, North Carolina 27612
(919) 782-2979

*Counsel for Appellee*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 14-6214          **Caption:** Eugene Dunston v. Donnie Harrison, et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓] this brief contains _____7,593_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ] this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Eric Laurence Doggett _____

Attorney for Appellee _____

Dated: 5/9/2014 _____

# CERTIFICATE OF SERVICE

I certify that on  May 9, 2014          the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

James Nicholas Ellis
Direct: 252-446-2341
Email: jnellis@poynerspruill.com
POYNER & SPRUILL
130 South Franklin Street
P. O. Box 353
Rocky Mount, NC 27802-0353

Caroline P. Mackie
Direct: 919-783-1108
Email: cmackie@poynerspruill.com
POYNER SPRUILL LLP
Suite 1900
301 Fayetteville Street
P. O. Box 1801
Raleigh, NC 27602-1801

Eric Laurence Doggett
_____
Signature

5/9/2014
_____
Date